Diann JEWELL, Plaintiff–Appellee,

v.

HOLZER HOSPITAL FOUNDATION, INC.; Dr. Raymond Jennings; Dr. Daniel H. Whitely; Dr. David Evans, Defendants,

Holzer Clinic, Ltd., Defendant–Appellant.

No. 89–3333.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 23, 1990.

Decided April 5, 1990.

---

Gerald S. Leeseberg (argued), Michael S. Miller, Wolske & Blue, Columbus, Ohio, for plaintiff-appellee.

Robert C. Seibel (argued), John V. Jackson, II, Jacobson, Maynard, Tuschman & Kalur, Cleveland, Ohio, for defendant-appellant.

Before KENNEDY and BOGGS, Circuit Judges; and HULL, Chief District Judge.*

BOGGS, Circuit Judge.

Holzer Clinic appeals a jury verdict for Diann Jewell in a diversity medical malpractice and wrongful death action arising out of the death of Jewell's husband. Holzer contends that the verdict should be reversed on the grounds that Jewell failed to present evidence on the necessary element of the ordinary standard of medical care and that Jewell's invocation of the physician-patient privilege was erroneously handled by the district court. We disagree and affirm the verdict.

I

William Jewell received care at the Holzer Clinic from May 1970 to March 1985.

---

* The Honorable Thomas G. Hull, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

During that time he made numerous visits to the Clinic. The initial visit in 1970 was to receive care after a cow stepped on one of his fingers. Mr. Jewell received a complete physical from Dr. Ralph Burner in June 1974. On a visit in August 1976, Mr. Jewell complained of pain in the upper abdomen. He saw Dr. Brubaker, who diagnosed indigestion-type pain. In 1978, Mr. Jewell visited the Clinic again in connection with a vasectomy and was attended to by Dr. Holzer. Mr. Jewell also complained of a lump on his right thigh. Dr. Holzer examined it and found it to be a fatty tumor.

Mr. Jewell received a complete physical examination at the Clinic in July 1980. A chest x-ray was taken. It revealed the presence of a "three centimeter nodule, noncalcified, in the lung." In visits to the Clinic after 1980, Mr. Jewell was examined by Drs. David Evans and Raymond Jennings. Mr. Jewell received complete physical examinations at the Clinic in September 1982 and April 1983. In April 1984, Mr. Jewell returned to the Clinic complaining of shortness of breath and chest tightness. Several tests were ordered. On February 4, 1985, Mr. Jewell returned to the Clinic for evaluation of chest discomfort. Dr. Jennings diagnosed costochodritis, an inflammation of the cartilage connecting the ribs to the sternum. When his condition did not improve, Mr. Jewell visited the Clinic on February 12. On March 15, another examination was performed. X-rays revealed a lesion in the upper part of the left lung. The lesion was partially obscured by the sternum and ribs, making its size difficult to determine. Tomograms (serial x-rays that reveal more than regular x-rays) confirmed the presence of a lung mass. A March 22 bone scan and x-ray revealed increased activity in the sternum and a thickened cortex on the thigh bone. At that time, Dr. Evans instructed Mr. Jewell to see a specialist. Dr. Evans wrote to Dr. Jeffrey Weiland at the Ohio State University Hospital, informing Dr. Weiland of Mr. Jewell's condition.

After March 28, 1985, all medical treatment of Mr. Jewell took place at the University Hospital. Mr. Jewell came under the care of Dr. Gerald Kakos, who surgically removed tissue masses from his right thigh and left lung in 1985. The tumors were malignant and of a type of cancer known as hemangiopericytoma. After referring Mr. Jewell to Dr. Lawrence Weis, an orthopedic oncologist, because of continued soreness in the sternum, Dr. Kakos removed a tumor from Mr. Jewell's sternum. The cancer metastasized to the pelvis, femur, and lungs. Mr. Jewell died on March 10, 1986.

Mr. Jewell's wife Diann brought the present diversity action against Holzer Clinic and several individual doctors on November 22, 1985, alleging medical negligence. After Mr. Jewell's death, the complaint was amended to add a cause of action for wrongful death. At trial, Diann Jewell dismissed all claims against the individual doctors and proceeded solely against the Clinic.

Prior to trial, Holzer deposed Jewell's expert witness, Dr. Weis. During the course of that deposition, Jewell's counsel indicated that Dr. Kakos would be made available to the defense for deposition as well. However, Jewell later filed a motion *in limine* to prohibit the taking of Dr. Kakos's testimony on the basis of the statutory physician-patient privilege located in the Ohio Code at O.R.C. § 2317.02(B). The court granted the motion, holding that the actions of Jewell's attorney in promising to make Kakos available did not constitute a waiver of the privilege. At trial, during cross-examination, Holzer attempted to question Jewell as to her invocation of the physician-patient privilege. The court sustained Jewell's objection and refused to allow such inquiry.

The jury returned a verdict for Jewell, awarding her $454,500. In response to jury interrogatories propounded after the verdict, the jury stated that the negligent actors had been Drs. Burner, Brubaker, and Holzer, and the "radiologists from the reading of the 1980 chest x-rays." The jury stated that negligence had occurred in the following ways:

1.  Lack of complete investigation of patients [sic] symptoms and complaints;

2.  Lack of proper record keeping;

3.  Lack of referring back to patients [sic] chart (or file) to compare previous symptoms/not proper reading of x-rays.

## II

### A. *Inconsistency of verdict with expert testimony*

Appellant maintains that the jury verdict for Jewell must be reversed because the jury interrogatories show that the jury did not believe Jewell's expert medical witness. Appellant's argument is as follows: Under Ohio law, a medical malpractice plaintiff must present expert medical testimony as to the standard of care required of a physician, *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), and in order for a plaintiff to recover, the jury must believe the plaintiff's medical expert witness that a physician failed to observe ordinary care. Appellee's only medical expert was Dr. Weis. Holzer maintains that Dr. Weis's testimony only established the appropriate standard of care in 1980 and afterward, but did not establish a standard of care for the period of time prior to 1980. The jury interrogatories showed that the jury believed the negligent physicians to be Drs. Burner, Brubaker, and Holzer. Yet all three doctors only examined the decedent prior to 1980. Thus, according to appellant, the jury's findings are inconsistent with the medical expert's testimony and the verdict must be reversed because Jewell failed to establish the elements of a malpractice claim as described in *Bruni*. Appellant argues that Fed.R.Civ.P. 49(b) also requires this court to overturn the verdict. The rule states:

> When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

Although state law governs the elements of a malpractice claim in a diversity case, in this case any question of the sufficiency of Jewell's evidence of malpractice arose out of the answers to the jury interrogatories. Federal law governs questions of the consistency of special verdicts and interrogatories in a trial in federal court. *See* 9 Wright & Miller, *Federal Practice and Procedure* § 2502:

> The Courts have uniformly ... refused to regard state law as controlling on the submission of special verdicts and interrogatories. State law does not govern ... the effect of inconsistency between a general verdict and a special interrogatory, or any other detail of the special verdict and interrogatory practice.

That position was adopted by this court in *Gulf Refining Co. v. Fetschan*, 130 F.2d 129, 134 (6th Cir.1942), *cert. denied*, 318 U.S. 764, 63 S.Ct. 666, 87 L.Ed. 1136 (1943). We therefore analyze the question of whether the verdict in this case must be reversed for failure to state a malpractice claim in terms of the effect of the jury interrogatories and thus, according to federal law. Federal law favors the harmonization of verdicts and answers to interrogatories wherever that is reasonably possible. *Tennessee Consolidated Coal Co. v. United Mine Workers*, 416 F.2d 1192, 1200 (6th Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970) (it is the duty of the court to harmonize jury answers to interrogatories if possible under a fair reading of them); *A & G Stevedores v. Ellerman Lines*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) (where there is a view of case that makes jury's answers consistent, they must be resolved that way); *Theurer v. Holland Furnace Co.*, 124 F.2d 494 (10th Cir.1941) (jury answers override general verdict only where conflict is beyond reconciliation on any reasonable theory consistent with the evidence and its inferences). Moreover, even if the answers to jury interrogatories and the verdict do conflict, federal law favors upholding the verdict if there exists some legal basis, supported by the evidence, upon which the verdict could be based. *Arnold v. Panhandle & Santa Fe Ry. Co.*, 353 U.S. 360, 361, 77 S.Ct. 840, 841, 1 L.Ed.2d 889 (1957) (answers do not present a square conflict

with verdict where they do not exhaust all possible grounds on which verdict could be based); *Julien J. Studley Inc. v. Gulf Oil Corp.*, 407 F.2d 521 (2d Cir.1969) (where answers are inconsistent with verdict, verdict may be upheld if there is a possible basis for verdict that was not addressed by jury interrogatories).

█ Nor does Fed.R.Civ.P. 49(b) require reversal in this case. That rule is not applicable. The rule applies to situations in which the verdict is inconsistent with the answers to jury interrogatories. In the instant case, however, there was a perfect consistency between the answers and the verdict; the answers indicated that Drs. Burner, Brubaker, and Holzer and the radiologists were negligent and the verdict was for Jewell. Rather than an inconsistency between the verdict and the answers to the interrogatories, what appellant alleges is an inconsistency between the verdict (as clarified by the answers) and the evidence. Thus, appellant's argument amounts to a claim of insufficient evidence (in the form of expert testimony) to support the jury's finding.

█ Jewell's questioning of Dr. Weis at trial included the following exchanges (emphasis added):

Q. Now, doctor, assuming that this lump in his thigh existed in Mr. Jewell's leg prior to 1980, and further assuming that a 1980 chest x-ray of Mr. Jewell demonstrated a questionable lesion in his lungs, do you have a medical opinion as to what the accepted standards of medical care for a physician under the same or similar circumstances would have been in evaluating and investigating and treating this condition for Mr. Jewell *in 1980*?

A. But if the soft tissue mass in his thigh were present *before 1980*, and if this were something that a physician was aware of, then the appropriate way to evaluate that would have been to find out what it was, and the minimal way to find out what that was would be to do a biopsy, and probably the most optimal way of finding out what it was would be to do a couple of investigational studies

first, like an x-ray, a CT scan and perhaps a bone scan and then do the biopsy, which probably could have been done just as a needle biopsy. And that would have been the appropriate way to evaluate that mass.

\*      \*      \*      \*      \*      \*

Q. Doctor, assuming the treatment, the diagnostic workup that you described, the biopsy and the excision of the tumor as being the appropriate standards of care *in 1980*, and further assuming that Mr. Jewell had reported this lump in his thigh to his treating physicians *in 1980, or prior to 1980*, do you have an opinion, a medical opinion, as to whether or not Mr. Jewell's *prior* treating physicians deviated from accepted standards of medical care in evaluating, investigating and treating the condition in his leg?

A. Making the assumptions you mentioned and also assuming that nothing was done by the physicians who were aware of this soft tissue mass, then I think that *not evaluating that was a deviation from standards of care.*

Q. Doctor, again assuming the basis for the question you previously answered, do you have an opinion as to whether or not Mr. Jewell would have survived his disease process if indeed it had been diagnosed and treated in accordance with accepted standards of medical care in 1980?

Dr. Weis answered that "if he had been treated *in 1980, or prior to that*, there is a probability that he would have survived his tumor." (Emphasis added.)

From that testimony, appellant argues that Jewell's case rested entirely on the argument that there was negligence in 1980 *or later*. Appellee argues, from the same testimony, that her case at trial clearly contemplated the possibility of negligence *prior to* 1980. For reasons described below, we hold that Dr. Weis's testimony described a standard of care sufficient to support the jury verdict.

Dr. Weis's testimony was not unambiguously directed to the time after 1980. It could reasonably support a conclusion by the finder of fact that actions taken prior to 1980 had failed to comport with the

standard of care in the profession. The tumor on Mr. Jewell's thigh was noticed first by Dr. Holzer in 1978. Dr. Weis's first response cited above addressed itself to the standard of care appropriate for the discovery of a tissue mass in the thigh prior to 1980. That standard could reasonably have been applied by the jury to Dr. Holzer's treatment of the lump in Mr. Jewell's thigh in 1978. Such an application by the jury could have led in turn to the conclusion that Dr. Holzer had not conformed to the ordinary standard of care of a physician and that he was therefore negligent. Having identified one theory under which the jury might have held for Jewell consistent with their answers to the post-trial interrogatories, we need go no further in order to uphold the verdict. We note, however, that the jury might also reasonably have concluded that as physicians familiar with Mr. Jewell's case, Drs. Burner and Brubaker bore some responsibility to conform to the ordinary standard of care for the treatment of a tissue mass once the mass had been discovered by Dr. Holzer.

Appellant characterizes the questions put to Dr. Weis by Jewell's counsel as directed only to establishing a standard of care after 1980. Even assuming that were the case, appellant's argument ignores the fact that Dr. Weis's answers to those very questions broadened the focus to include actions that took place prior to 1980. The focus of Dr. Weis's testimony was not as one-sided as appellant would have us believe on appeal. At three points in the trial, appellant argued the opposite of the position it now argues; that Dr. Weis's testimony established a standard of care for the period of time prior to 1980 only. On cross-examination of Dr. Weis, appellant's counsel asked:

> Q. If I understand you, your opinion regarding deviation from standard of care relates only to care and treatment he received *before 1980.* Am I clear in that understanding?

(Emphasis added.) Appellant's counsel later moved for a directed verdict as to any negligence that may have occurred after 1980, on the ground that Dr. Weis testified only to negligence that occurred in 1980, or prior thereto:

> So we are going to ask for a directed verdict on any medical care and treatment that was rendered *after 1980.* There is no testimony that there was any deviation from any standard of care as to medical care rendered *after 1980....* Dr. Weis specifically indicated his opinion related to care *before 1980.*

> \* \* \* \* \* \*

> [T]he only medical testimony in this case ... is that of Dr. Weis, and Dr. Weis said he just criticizes care *before 1980.*

(Emphasis added.)

The court denied the motion. Appellant later raised the motion again:

> Judge, I would like to renew the motion ... that the only issues that are to be considered by the jury would be any acts or omissions *prior to 1980....*

> \* \* \* \* \* \*

> They do have, we agree, sufficient facts and some testimony from Dr. Weis indicating a deviation by somebody at some time *before 1980....*

(Emphasis added.)

We do not cite the foregoing passages in order to suggest that appellant's actions at trial work as an estoppel to prevent it from arguing on appeal that Dr. Weis only testified as to treatment after 1980. They merely tend to refute the argument that it was clear at trial that Dr. Weis's testimony was directed exclusively to establishing a standard of care for the period of time after 1980. At the least, Dr. Weis's testimony was ambiguous enough to permit appellant to make a good faith argument at trial that it established a standard of care for actions prior to 1980.

We agree with appellant that Jewell failed to present expert medical testimony that would establish that the reading of the 1980 chest x-ray was negligently performed by a Holzer radiologist. However, that fact does not compel us to overturn the jury's verdict. Although the jury found one of the elements of the Clinic's negligence to be the reading of the 1980 x-ray, its verdict was based as well on its finding of negligence by physicians Burner,

Brubaker, and Holzer. As noted above, the latter finding was supported by expert medical testimony. Therefore, we hold that Jewell presented sufficient evidence to support the jury's general verdict of negligence on the part of Holzer Clinic.

## B. *Physician-patient privilege*

The district court refused to allow appellant to depose Dr. Kakos because of Jewell's assertion of the physician-patient privilege. The court also prevented appellant from cross-examining Jewell about her invocation of the privilege. Appellant argues that these decisions were in error for two reasons: (1) the physician-patient privilege was not available because Jewell's counsel had waived the privilege by initially agreeing to make Dr. Kakos available for deposition, and (2) even if the privilege was not waived, the jury was entitled to draw a negative inference from appellee's invocation of the privilege, but was prevented from doing so by the court's ruling that Holzer could not cross-examine Jewell on that point. We disagree and hold that the district court did not err in its ruling on either question.

■ In a civil case involving claims based on state law, the existence of a privilege is to be determined in accordance with state, not federal, law. Fed.R.Evid. 501. In Ohio, the physician-patient privilege is statutory. O.R.C. § 2317.02(B)(1) provides that the physician-patient privilege may be waived "by the express consent of the surviving spouse or the executor or administrator of the estate of such deceased patient...." The actions of Jewell's counsel in initially agreeing to make Dr. Kakos available to the defense for deposition did not constitute an "express consent" by Jewell to waive the privilege. The alleged waiver of the privilege with regard to Dr. Kakos occurred during the course of the deposition of Dr. Weis. Appellant's counsel asked Jewell's counsel whether appellee would permit the deposition of Dr. Kakos and another physician. Jewell's counsel responded: "That's fine, you can take their deposition." While the comment no doubt indicated a waiver to appellant at the time

it was made, the comment alone is not a sufficient indication of Jewell's intentions to constitute "express consent" to waive the privilege. In ruling on this question, the trial court properly noted that the comment of Jewell's counsel did not indicate that counsel had discussed the matter with his client and that the client had authorized him to waive the privilege. At a minimum, counsel would have had to give some indication that Mrs. Jewell had expressed herself on the specific question of waiver in order for his comment at the deposition of Dr. Weis even arguably to constitute a waiver of the physician-patient privilege with regard to Dr. Kakos.

■ Waiver of the physician-patient privilege may also occur, absent expressed consent, where the party asserting the privilege testifies as to the specifics of the party's medical condition or the treatment received from the physician with regard to whom the privilege is asserted. *Covington v. Sawyer*, 9 Ohio App.3d 40, 458 N.E.2d 465 (1983); *Baker v. Industrial Commission*, 135 Ohio St. 491, 21 N.E.2d 593 (1939). The rationale for such waiver is presumably that the party asserting a privilege should not be allowed to benefit from its presentation of information which it is withholding from the opposing party. There is no such danger in this case. Jewell did not attempt to benefit from evidence relating to the specifics of Dr. Kakos's treatment of her husband. Indeed, since Dr. Kakos did not begin to treat Mr. Jewell until 1985, and the jury found that the negligent actions in this case had occurred prior to 1980, the relevance of Dr. Kakos's deposition to the ultimate outcome of the case is questionable.

■ Next, appellant argues that by not permitting it to cross-examine Jewell on the question of why she had invoked the physician-patient privilege with respect to Dr. Kakos, the district court deprived the jury of the right to draw negative inferences from the invocation of the privilege. Appellant cites *McKinney v. Galvin*, 701 F.2d 584, 589 (6th Cir.1983) (jury may draw inference that privileged witness would have testified unfavorably to party holding privi-

lege) and *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) (prisoner's privileged silence during disciplinary hearing may be used against him).

Once again, however, Rule 501 dictates that we look to state law to determine whether a court must allow a jury to draw a negative inference from a party's invocation of a privilege. Although recent Ohio decisions have not addressed the issue, the rule is clear in earlier decisions. Under Ohio law, there is a general rule that a jury may draw a negative inference from a party's failure to produce, or failure to explain the omission of, relevant evidence within his control and not equally available to the opposing party. *State ex rel. Raydel v. Raible*, 69 Ohio L.Abs. 356, 117 N.E.2d 480 (Ohio App.1954); *Cleveland Concession Co. v. City of Cleveland*, 84 Ohio App. 1, 83 N.E.2d 818 (1948). However, there is an exception to the general rule. The general rule does not apply "where a party has failed to call a privileged witness or has invoked the privilege to exclude the testimony of such a witness." *State v. Raible*, 117 N.E.2d at 486. A fuller explanation of the exception is found in *McLaughlin v. Mass. Indem. Ins. Co.*, 85 Ohio App. 511, 84 N.E.2d 114, 118 (1948):

> There is a general rule that where a party refuses to produce evidence which he has in his power to produce, that the jury may properly infer that such evidence if produced will be unfavorable to him. There is, however, an exception to this rule, that where such evidence is privileged and the party refusing to permit its production has a legal right to so refuse, then the protection of the privileged statute will not be allowed to be destroyed indirectly by permitting opposing counsel to repeatedly call for its production or to argue to the jury that the evidence must be unfavorable or it would have been produced.

In view of the law in Ohio, we hold that it was not error for the trial court to refuse to allow appellant to raise the issue of Jewell's invocation of the physician-patient privilege on cross-examination.

For the foregoing reasons we AFFIRM the verdict in the district court.